UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

DEQUARIUS D. FITZPATRICK,

        Plaintiff,

       v.                                        Case No. 24-cv-961-scd

REBECCA FRISCH, et al.,

        Defendants.

## DECISION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

      Plaintiff Dequarius D. Fitzpatrick, who is representing himself, is proceeding on an Eighth Amendment deliberate indifference claim against Defendants Rebecca Frisch and Jay Howarth in connection with a self-harm incident at the Green Bay Correctional Institution on July 18, 2021. Dkt. Nos. 1 & 7. On July 3, 2025, Defendants filed a motion for summary judgment. Dkt. No. 24. On October 14, 2025, Plaintiff filed a motion for leave to file a sur-reply. Dkt. No. 41. Because no reasonable jury could conclude that Defendants were deliberately indifferent, the Court will grant Defendants' motion for summary judgment and will dismiss the case. The Court will also deny Plaintiff's motion for leave to file a sur-reply because Defendants did not raise any new facts or arguments in their reply brief that required a sur-reply from Plaintiff.

## FACTUAL BACKGROUND

      At the relevant time, Plaintiff was an inmate at the Green Bay Correctional Institution, where Frisch was a Captain and Howarth was a Correctional Sergeant. Dkt. No. 26, ¶¶1-3. On July 18, 2021, at around 7:00 a.m., Plaintiff stopped Sgt. Howarth in front of his cell and reported feeling upset that he was still housed in the Restrictive Housing Unit (RHU). *Id*., ¶14. At that time, Plaintiff had been in RHU for about four months—since March 25, 2021—when he received

a sentence of 120 days disciplinary separation for a major conduct violation. *Id.*, ¶9. Sgt. Howarth radioed Cpt. Fritsch, who responded that Plaintiff's 120-day disciplinary separation was up in ten days—on July 28, 2021—and that he was on a "cut-out list," meaning that he may be released from RHU early if the institution needed additional bedspace in the unit. *Id.*, ¶17. Sgt. Howarth relayed this information to Plaintiff. *Id.*, ¶18. According to Sgt. Howarth, Plaintiff seemed happy with the information, stated that he was "good," was not actively self-harming, nor communicated any specific plan or item he would use to self-harm. *Id.*, ¶¶18 & 20. In other words, Sgt. Howarth did not believe Plaintiff was suicidal at that time based on that interaction. *Id.*, ¶¶20 & 21. Plaintiff confirms in his response materials that "he never threatened self-harm if he was not moved back to general population that day." Dkt. No. 37, ¶¶14 & 20. Sgt. Howarth reported back to Cpt. Fritsch that she was no longer needed on the unit and he carried on with his other duties that day. Dkt. No. 26, ¶19.

  According to Plaintiff, about three hours later at around 10:00 a.m., he dug his fingers into an old wound that was healing. Dkt. No. 26, ¶¶25 & 33. At about 10:30 a.m., Sgt. Howarth was radioed to assist at Plaintiff's cell. *Id.*, ¶¶22 & 23. When Sgt. Howarth arrived, he saw some blood on the floor but Plaintiff was not actively self-harming. *Id.*, ¶24. Sgt. Howarth contacted Cpt. Fritsch to notify her of the situation and she arrived a short time later. *Id.*, ¶¶24 & 27. Plaintiff initially refused to leave his cell, but after some back and forth, Plaintiff finally agreed to go to the Health Services Unit (HSU) for medical treatment. *Id.*, ¶¶26-28.

  Nurse Lindsay Sorenson (not a defendant) examined Plaintiff at around 10:45 a.m. *Id.*, ¶29. She noted that Plaintiff had reopened a prior wound and that his vital signs were stable and within normal limits. *Id.* She cleaned the wound with saline and an antimicrobial/antiseptic soap. *Id.* She then applied a benzoin tincture and bandaged the wound using one steri-strip. *Id.* While Plaintiff was in HSU, Cpt. Fritsch contacted the Psychological Services Unit (PSU) and notified Dr. Alleah Pynenberg (not a defendant) of Plaintiff's behavior. *Id.*, ¶30. Dr. Pynenberg

2

determined that Plaintiff required clinical observation status with property restrictions. *Id*. HSU staff then medically "cleared" Plaintiff and told him that Dr. Pynenberg ordered observation status. *Id.*, ¶31. Because Plaintiff's cell had blood and needed to be cleaned, he was moved to a hearing room while his new observation cell was prepared. *Id*., ¶¶28 & 32. In accordance with prison protocol, Plaintiff was strip-searched in the hearing room and provided a kilt to wear. *Id*., ¶33.

Once Plaintiff's observation cell was ready, Cpt. Fritsch went to the hearing room to move him. *Id.*, ¶¶34-37. At that point, Plaintiff became agitated and would not cooperate with the transfer. *Id*. According to Cpt. Fritsch, Plaintiff stated that he wanted to go back to general population and would continue to self-harm if he was transferred to the observation cell. *Id.* According to Plaintiff, he confirms that he threatened self-harm at this time, but he states that he was genuinely suicidal and "not safe." *See* Dkt. No. 38, ¶5. In response, Cpt. Fritsch told correctional staff to watch Plaintiff while she called Dr. Pynenberg again. Dkt. No. 26, ¶35. Dr. Pynenberg affirmed that Plaintiff needed to be placed in an observation cell despite his threats to reopen his wound if left there, and she adjusted his property restrictions so that he would only have a kilt inside the cell. *Id*., ¶¶35 & 36. Plaintiff's cell would be completely empty, aside from its permanent fixtures, until he could show that he wasn't going to self-harm. *Id*., ¶¶13 & 36. After some additional back and forth, Plaintiff finally agreed to cooperate with the transfer to the observation cell at about 1:00 p.m. *Id*., ¶38. According to Cpt. Fritsch, Plaintiff stated that, once he was uncuffed in the observation cell, he was going to self-harm and wanted all of the officers to watch. *Id*. Consistent with his threat, once Plaintiff was uncuffed inside his observation cell, he immediately placed his arms out of the upper food port, removed his single steri-strip, and stuck his finger in the wound in an attempt to make it bleed. *Id*., ¶42. Cpt. Fritsch states that there was no blood at the time; Plaintiff states that there was blood. *Id*.; Dkt. No. 37, ¶¶42 & 45. Cpt. Fritsch directed Plaintiff to remove his arm from the food port then closed and secured the port door. Dkt. No. 26, ¶¶43-45. Correctional staff checked on Plaintiff every fifteen minutes for the

3

remainder of the 24 hours he was on observation in accordance with prison policy. *Id.*, ¶¶12, 46, & 52. According to Cpt. Fritsch and Sgt. Howarth, they had no further interactions with Plaintiff on July 18, 2021. *Id.*, ¶47. Sgt. Howarth's shift ended at 2:00 p.m. *Id.*, ¶6. Cpt. Fritsch's shift ended at 10:00 p.m. *Id.*, ¶5.

According to Plaintiff, he had one additional interaction with Sgt. Howarth that day. Dkt. No. 38, ¶¶6-9. Plaintiff claims that, at around 1:15 p.m., CO Dietrich (not a defendant) did an observation check, saw blood on the window, and called Sgt. Howarth to Plaintiff's cell. *Id.*, ¶6. Sgt. Howarth allegedly "looked at [Plaintiff's] actively bleeding arm, and instead of getting [him] medical attention…walked off..." *Id.*, ¶7. CO Dietrich allegedly did two more observation checks and did not provide medical care. *Id.*, ¶8. It wasn't until 2:00 p.m., when second shift arrived, that Plaintiff received the medical care he needed. *Id.*, ¶9. The treatment was the same as he received earlier in the day—cleansing with saline and an antimicrobial/antiseptic soap then application of a benzoin tincture, a steri-strip, and gauze/dressing. *Id*. Plaintiff had additional mental health evaluations that day, on July 18, 2021, and the following day, on July 19, 2021, and was deemed in stable condition. Dkt. No. 26, ¶¶49 & 51.

According to Defendants, neither Cpt. Fritsch nor Sgt. Howarth believed that Plaintiff was sincere in his threats of self-harm that day. *Id.*, ¶¶54 & 55. They explain that Plaintiff has a long history of picking at or reopening a scab on his arm in an attempt to manipulate staff. *Id.*, ¶39; *see also Fitzpatrick v. Sergeant Nys*, No. 19-C-1024, 2020 WL 5821773, at *3 (E.D. Wis. Sept. 30, 2020) (citing cases); *Fitzpatrick v. Fairchild, et al.*, Case No. 21-C-978-LA (dismissed Apr. 3, 2024); *Fitzpatrick v. Cushing*, Case No. 23-C-118-LA (dismissed May 10, 2024). Cpt. Fritsch and Sgt. Howarth are not aware of any instance in which Plaintiff's reopening of the scab caused a significant injury, much less a risk of death. Dkt. No 26, ¶39. They believed that Plaintiff's threats of self-harm were an attempt to manipulate staff to take him back to general population. *Id.*, ¶¶14, 34, 37, & 54. Cpt. Fritsch further explains that neither she nor her staff could stay at Plaintiff's

4

cell front indefinitely because they had other responsibilities at the institution. *Id.*, ¶44. It was her experience that allowing Plaintiff to interfere with her duties by forcing her to stay at his cell front reinforced his behavior of manipulating staff. *Id.* She explains that it is best to end conversations rather than engaging with him because it causes him to continue to misbehave. *Id.*, ¶¶40 & 41.

## LEGAL STANDARD

Summary judgment is appropriate when the moving party shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* All reasonable inferences are construed in favor of the nonmoving party. *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004). The party opposing the motion for summary judgment must "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (citations omitted). "The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* Summary judgment is properly entered against a party "who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Parent v. Home Depot U.S.A., Inc.*, 694 F.3d 919, 922 (7th Cir. 2012) (internal quotations omitted).

## ANALYSIS

Prison officials violate the Eighth Amendment when their conduct demonstrates deliberate indifference to a substantial risk of serious harm to inmate health or safety. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994). To survive summary judgment on an Eighth Amendment deliberate indifference claim, Plaintiff must establish that: "(1) the harm that befell him was objectively, sufficiently serious, and posed a substantial risk to his health or safety, and (2) the individual

5

defendant[] [was] deliberately indifferent to the substantial risk to his health and safety." *Collins v. Seeman*, 462 F.3d 757, 760 (7th Cir. 2006) (citing *Farmer*, 511 U.S. at 832). Genuine suicidal ideation is an objectively serious medical condition, *see Lisle v. Welborn*, 933 F.3d 705, 716 (7th Cir. 2019), and a prison official cannot ignore or fail to treat a prisoner who is genuinely suicidal, *see Lord v. Beahm*, 952 F.3d 902, 904 (7th Cir. 2020). The risk of suicide is a grave one, "not one that today's society chooses to tolerate." *Quinn v. Wexford Health Sources, Inc.,* 8 F.4th 557, 565 (7th Cir. 2021).

"Where the harm at issue is a suicide or attempted suicide, the second, subjective component of an Eighth Amendment claim requires a dual showing that the defendant: (1) subjectively knew the prisoner was at substantial risk of committing suicide [,] and (2) intentionally disregarded the risk." *Collins*, 462 F.3d 757 at 761 (citing *Matos el rel. Matos v. O'Sullivan,* 335 F.3d 553, 556 (7th Cir. 2003). The defendant must be "cognizant of the significant likelihood that an inmate may imminently seek to take his own life[.]" *Id*. (citing *Sanville v. McCaughtry*, 266 F.3d 724, 737 (7th Cir. 2001). The evidence must show that the defendant prison official "knew of a significant likelihood that the inmate would imminently attempt" self-harm or suicide then "failed to take reasonable steps to prevent it." *Davis-Clair v. Turck*, 714 F. App'x 605, 606 (7th Cir. 2018). A "risk of future [self-harm] must be 'sure or very likely' to give rise to 'sufficiently imminent dangers' before an official can be liable for ignoring that risk." *Id. (quoting Baze v. Rees*, 553 U.S. 35, 50 (2008)). Additionally, a defendant with knowledge of a risk need not "take perfect action or even reasonable action." *Cavalieri v. Shepard,* 321 F.3d 616, 622 (7th Cir. 2003). Instead, the evidence must show "callous disregard" for an inmate's wellbeing. *Rasho v. Jeffreys*, 22 F.4th 703, 710 (7th Cir. 2022).

For purposes of this motion, the Court will assume that Plaintiff suffered an objectively serious risk of harm on July 18, 2021. But no reasonable jury could conclude that Defendants were deliberately indifferent. With respect to Sgt. Howarth, he had at most three interactions with

6

Plaintiff that day. The first interaction—at around 7:00 a.m.—is not at dispute. Sgt. Howarth asserts that he did not believe Plaintiff was suicidal at the time and Plaintiff admits that he did not threaten self-harm during that interaction. Dkt. No. 37, ¶14. The second interaction occurred around 10:30 a.m., *after* Plaintiff had already engaged in self-harm. In response to that self-harm attempt, Sgt. Howarth immediately reported to Plaintiff's cell, called for a supervisor, then monitored Plaintiff until Capt. Frisch arrived. These actions were consistent with what prison policy required and nothing in the record shows that Sgt. Howarth said or did anything during that interaction showing "callous disregard" for Plaintiff's wellbeing. To the contrary, he responded appropriately and exactly as he was expected to under prison policy.

A third interaction with Sgt. Howarth allegedly occurred later in the afternoon. According to Plaintiff, at around 1:15 p.m., Sgt. Howarth came back to his cell, saw blood on the floor, and simply "walked off." According to Sgt. Howarth, this interaction never occurred and he was not even assigned to work in the observation unit at the time. But even assuming Plaintiff's version of events is true, no reasonable jury could find that Sgt. Howarth was deliberately indifferent. As a preliminary matter, it was not Sgt. Howarth's responsibility to monitor Plaintiff while he was on observation status. Plaintiff admits that CO Dietrich was the individual responsible for observation checks and he states that CO Dietrich came back for two more observation checks—at 1:30 p.m. and 1:45 p.m.—without any assistance for his allegedly bleeding wound. *See* Dkt. No. 38, ¶¶7 & 8. Plaintiff cannot demand that Sgt. Howarth do someone else's job; and Sgt. Howarth is not responsible for CO Dietrich failing to do his own job. *Burks v. Raemisch*, 555 F.3d 592, 593-95 (7th Cir. 2009). And neither was this the sort of situation where the niceties of particular job duties would be thrown out the window by an obvious medical emergency. Additionally, by the time the third interaction allegedly occurred, Plaintiff was already in the most secure status and location he could be in. He was already in an observation cell with no property other than his kilt, he was already being monitored every 15 minutes by individuals responsible for that task, and Dr.

7

Pynenberg had already twice ordered that Plaintiff had to remain in his observation cell even though he had threatened self-harm if he remained there.  It's unclear what more Sgt. Howarth could have reasonably done at the time given that he did not have the medical expertise or authority to override Dr. Pynenberg's treatment order.  *See e.g. Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010) (noting that "[t]he law encourages non-medical security and administrative personnel at jails and prisons to defer to the professional medical judgments of the physicians and nurses treating the prisoners in their care.").

Plaintiff focuses on the fact that Sgt. Howarth should have ordered immediate medical care at 1:15 p.m. when he allegedly saw blood on the floor. But Plaintiff admits that he received medical care within 45 minutes, at around 2:00 p.m., when second shift arrived. There is nothing unreasonable about waiting 45 minutes for medical care, particularly for a skin wound.  Indeed, ordinary citizens who are not in state custody often have to wait far longer at their doctor's offices, urgent care clinics, and the emergency room to receive medical care for conditions far worse than a reopened wound.  Plaintiff is not entitled to better and speedier medical care than what is available to the general public. *See Langston v. Peters*, 100 F.3d 1235, 1240-41 (7th Cir. 1996). That issue aside, Plaintiff also has no evidence showing that the alleged 45-minute delay in receiving medical care exacerbated his condition or caused unnecessary pain. *See Wilson v. Adams*, 901 F.3d 816, 822 (7th Cir. 2018).  To the contrary, the record shows that the wound was relatively minor and he received the exact same medical treatment he received earlier in the morning.  Under these circumstances, no reasonable jury could conclude that Sgt. Howarth was deliberately indifferent on July 18, 2021.  Therefore, he is entitled to summary judgment.

With respect to Capt. Frisch, she first became aware of Plaintiff's self-harm at around 10:30 a.m. when Sgt. Howarth called for a supervisor.  In response, she reported to Plaintiff's cell, prepared an extraction team when Plaintiff initially refused to leave the cell, escorted Plaintiff to HSU for medical treatment, then called PSU for instructions on how to proceed in connection with

8

his mental health. Dr. Pynenberg placed a treatment order for observation status and Capt. Frisch followed that order. When Plaintiff then threatened to self-harm again if placed in observation, Capt. Frisch called Dr. Pynenberg a second time, and Dr. Pynenberg affirmed that Plaintiff should be placed in observation status anyway with no property. Capt. Frisch followed that order as well. Like Sgt. Howarth, Capt. Frisch responded appropriately and exactly as she was expected to under prison policy.

Plaintiff argues that, when he attempted to stick his fingers into his wound at around 1:00 p.m. through the food port, Capt. Frisch should have immediately acted to do something else—*i.e.*, take him to the emergency room, order a restraint chair/restraint jacket, remain by his cell to monitor him, etc. Plaintiff states that she should not have closed the food port door and left. But as noted above, by that point in time, Plaintiff was under Dr. Pynenberg's medical care and Capt. Frisch was entitled to defer to her medical orders. In other words, Dr. Pynenberg was already aware that Plaintiff had threatened self-harm if placed in an observation cell, yet she ordered that he be left there anyway, believing a more serious self-injury would not occur. Capt. Frisch was entitled to defer to that medical opinion; and she was not required to call Dr. Pynenberg for a *third* time to confirm her order. Dr. Pynenberg certainly could have ordered a restraint chair/jacket or cell-side monitoring, but she did not, and it would not have been Capt. Frisch's place to do so given that she was only correctional staff. Additionally, Capt. Frisch could not have remained by Plaintiff's cell for the entire day for logistical and security reasons. She had other duties and responsibilities at the institution; and Plaintiff was already in the most secure status and location he could be in. It was also Capt. Frisch's experience that engaging with Plaintiff did not resolve the issue or calm him down anyway—it only worsened his behavior. Under these circumstances, no reasonable jury could conclude that Capt. Frisch was deliberately indifferent on July 18, 2021.

In sum, Sgt. Howarth and Capt. Frisch responded exactly as they were supposed to on July 18, 2021. Upon finding out about the self-harm incident at around 10:30 a.m., they contacted

9

supervisors, took Plaintiff to HSU for medical care for his physical injury, called PSU for instructions on how to proceed for his mental health care, then followed those instructions. Plaintiff's purported factual disputes—the 1:00 p.m. incident when he allegedly stuck his fingers into his wound and the 1:15 p.m. incident where Sgt. Howarth allegedly "walked off" despite seeing blood on the floor—do not change the analysis. By that point in time, Sgt. Howarth and Capt. Frisch were both deferring to the medical expertise of Dr. Pynenberg, who was aware that Plaintiff had threatened self-harm if left alone in the observation cell, yet believed he still belonged there because it was the safest location at the institution. Additionally, Plaintiff received medical care for the alleged 1:00 p.m. injury within a reasonable amount of time, and his condition did not deteriorate during the wait for that medical care. In fact, Plaintiff received the same exact medical care he received earlier in the day.

Ultimately, the Constitution requires an adequate level of medical care. The Plaintiff received that here. Even so, he seems to believe that the staff were required to jump and lurch at his every attempt to pick at a scab. The defendants are public servants with countless duties, not concierge medical staff in the private employ of the Plaintiff. That the staff did not behave like the Plaintiff's own personal marionettes does not mean they violated the Constitution. Based on this record, no reasonable jury could conclude that Sgt. Howarth and Capt. Frisch were deliberately indifferent or acted with "callous disregard" for Plaintiff's wellbeing. Therefore, Defendants are entitled to summary judgment and the Court will dismiss the case.

## MOTION FOR LEAVE TO FILE A SUR-REPLY

On October 14, 2025, Plaintiff filed a motion for leave to file a sur-reply reiterating points he made in his response brief. Dkt. No. 41. Summary judgment briefing typically consists of a moving brief, a response brief, and a reply brief. Civ. L. R. 56(b) (E.D. Wis.). The party that bears the burden of persuasion on the motion is usually entitled to the last brief on the matter. The Court has discretion to allow supplemental briefing, but sur-replies are limited to responding to

any <u>new</u> facts or arguments raised in the reply. Defendants did not raise any new facts and arguments in their reply that requires a sur-reply; and Plaintiff's proposed sur-reply does not contain any new arguments or facts. Therefore, the Court will deny Plaintiff's motion for leave to file a sur-reply.

## CONCLUSION

**IT IS THEREFORE ORDERED** that Defendants' motion for summary judgment (Dkt. No. 24) is **GRANTED**; and this case is **DISMISSED**. The Clerk is directed to enter judgment accordingly.

**IT IS FURTHER ORDERED** that Plaintiff's motion for leave to file a sur-reply (Dkt. No. 41) is **DENIED**.

Dated in Milwaukee, Wisconsin this 4th day of December, 2025.

_____
STEPHEN C. DRIES
United States Magistrate Judge

This order and the judgment to follow are final. Plaintiff may appeal this Court's decision to the Court of Appeals for the Seventh Circuit by filing in this Court a notice of appeal within **30 days** of the entry of judgment. *See* Fed. R. App. P. 3, 4. This Court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. *See* Fed. R. App. P. 4(a)(5)(A). If Plaintiff appeals, he will be liable for the $605.00 appellate filing fee regardless of the appeal's outcome. If Plaintiff seeks leave to proceed *in forma pauperis* on appeal, he must file a motion for leave to proceed *in forma pauperis* with this Court. *See* Fed. R. App. P. 24(a)(1). Plaintiff may be assessed another "strike" by the Court of Appeals if his appeal is found to be non-meritorious. *See* 28 U.S.C. §1915(g). If Plaintiff accumulates three strikes, he will not be able to file an action in federal court (except as a petition for habeas corpus relief) without prepaying the filing fee unless he demonstrates that he is in imminent danger of serious physical injury. *Id.*

Under certain circumstances, a party may ask this Court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment. Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of judgment. The Court cannot extend these deadlines. *See* Fed. R. Civ. P. 6(b)(2).

A party is expected to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.